**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **DRA PROPERTIES, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 24 C 8285** |
| | ) | |
| **CITY OF GENEVA, ILLINOIS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

DRA Properties, LLC has sued the City of Geneva, Illinois, alleging that it violated two provisions of the Telecommunications Act of 1996 (TCA) when it denied DRA's special use permit application. The special use permit would allow DRA to construct an 85-foot-tall cell tower on a parcel of land commonly referred to as the "Geneva Christina" site. According to DRA, the tower would address a gap in wireless service that exists in the area. DRA seeks a declaratory judgment that Geneva's denial of the special use permit application was not supported by substantial evidence in violation of 47 U.S.C. § 332(c)(7)(B)(iii) (count 1) and had the effect of prohibiting the provision of personal wireless services in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II) (count 2). DRA also seeks an injunction or writ of mandamus compelling Geneva to grant the special use permit and all other necessary permits.

DRA and Geneva have filed cross motions for summary judgment. For the reasons below, the Court grants Geneva's motion for summary judgment on count 1 but denies it on count 2. The Court denies DRA's motion.

**Background**

The following facts are undisputed unless otherwise noted.  DRA develops, owns, and leases wireless communications facilities in Illinois and elsewhere in the country.  Geneva is located in Kane County, Illinois, forty miles west of Chicago.  It has a population of approximately 21,000 and is bordered on the west by unincorporated land in Kane County, on the north by St. Charles, on the east by West Chicago, and on the south by Batavia.

DRA leases space on its properties to wireless providers, including Verizon. DRA also constructs towers and other wireless facilities that allow wireless providers to create and maintain a network of cell sites.  To provide reliable service, Verizon must have a network of cell sites that overlap in a grid pattern.  Verizon radio frequency engineers use various techniques, such as sophisticated computer generation programs and field testing, to determine where a new wireless facility is required.  From this, the engineer identifies a "search ring"—a targeted area in which a site could be located and that has a high probability of addressing and meeting the coverage and/or capacity objectives.

In 2017, Verizon engaged Dolan Realty Advisors to search for a solution to a coverage gap that, according to Verizon, exists in Geneva.  DRA's president, Doug Dolan, owns DRA and Dolan Realty Advisors.  In June 2019, Dolan hired a contractor, Paul Sileo, to search for potentially viable locations in Geneva.  At one point, Dolan instructed Sileo:  "When you come across one interested candidate with decent zoning prospects, we can stop the research side and try and get [a] business term agreement with this candidate."  Def.'s L.R. 56.1 Stmt., Ex. 4.

On July 8, 2019, Sileo reported to Dolan that he had reached out to the owners of five potential properties within the search ring. One of these properties was 1749 S. Randall Road, at the southeast of the intersection of Randall Road and Christina Avenue in Geneva, referred to by the parties as the "Geneva Christina" site. Later that month, Sileo reported to Dolan that the Geneva Christina site's owner was "interested and would like a more detailed rundown of the terms and potential lease area." Def.'s L.R. 56.1 Stmt., Ex. 2 at 42:14–15. Dolan testified that he did not recall how DRA handled communications with the other property owners after the owner of the Geneva Christina property responded to Sileo.

On October 3, 2023, DRA submitted a special use permit application seeking permission to build an 85-foot wireless service tower on the Geneva Christina property. The tower would be 30 inches in diameter and would be surrounded by an equipment compound and an eight-foot-tall brick masonry wall. DRA contends that the tower is designed to look like a flagpole, with the antennas hidden from public view by being placed inside the pole, and the outside painted a light grey color. Geneva disputes that the tower would look like a flagpole. Verizon and DRA stated that the purpose of the Geneva Christina tower was to address a gap in Verizon's wireless service in the area.

Geneva's zoning code governs the permissible uses of land throughout the city. The code seeks:

> A. To protect residential, business, commercial and industrial areas alike from harmful encroachment by incompatible uses and to ensure that land allocated to a class of uses shall not be usurped by other inappropriate uses.
>
> B. To establish standards for the provision of light, air and open space.
>
> C. To zone all properties with the intent to conserve the value of buildings

3

and land and to encourage the most appropriate use of land throughout the city.

. . .

H. To foster compatible relationships between residential, business, commercial and industrial uses for the mutual benefit of all.

. . .

J. To establish reasonable standards to which buildings and structures shall conform, and to encourage reasonable flexibility of development design through appropriate innovation.

K. To provide for the regulation of nonconforming buildings, structures and uses.

. . .

O. To implement the objectives of the Geneva comprehensive plan, as well as protect all appropriate existing structures and uses. P. To improve and enhance the overall physical environment of the city of Geneva as generally set forth as part of the Geneva comprehensive plan. . . .

Geneva Code § 11-1-3.

In April 2003, Geneva adopted a comprehensive plan that also guides the city's zoning decisions. The comprehensive plan states that Geneva's "natural setting is one of its key community assets." Admin. Rec., dkt. 33-1, at 5. It also states that "Geneva is recognized for its Downtown, its historic architecture, its upscale residential neighborhoods and its prime location along the Fox River and the Fabyan Forest Preserve." *Id.* Specifically related to Randall Road, the plan states that the "attractiveness of the Randall Road corridor is also dependent on the views to the outside of the corridor across the adjacent landscape." *Id*. at 45. Accordingly, views to "unique features such as wetlands should be preserved. This may mean limiting building development along an edge so that sight lines can be preserved for travelers on Randall Road." *Id*. The comprehensive plan further states that "[p]arks and open

4

spaces are—and should continue to be—hallmarks of the Geneva community." *Id*. at 49. The plan's "action agenda" states that it is a priority to use the plan "to guide the development of more detailed planning and design of public improvements along the [Randall Road] Corridor including streetscape, sidewalk design, entry features and gateway signage, key features, pedestrian amenities, medians, lighting and other public area improvements." *Id*. at 54.

Geneva has various zoning districts. The Geneva Christina property is in a B5 business district. The property is bordered by a B1 business district to the north and a R1 residential district to the east, as depicted below. In a B5 business district, a wide range of retail and service businesses as well as large scale regional shopping facilities are allowed, such as department stores, home improvement centers, and motor vehicle sales. Smaller retail and service businesses are allowed in a B1 business district.



Figure 2. Zoning Map of the Subject Property and Surrounding Area. Prepared by Geneva Planning Division, May 2024.

With the exception of an antenna mounted on a city water tower, the Geneva

5

zoning code provides that a request for a wireless communication facility—including a cell tower—requires a special use permit in all zoning districts. Geneva Code § 11-3-12(C)(1-4). The City Council has the authority to grant special use permits under certain circumstances. *Id.* § 11-14-4. These permits require special uses, such as cell towers, to "satisfy specified standards . . . to minimize or eliminate the potentially harmful characteristics or off-site impacts of such uses on uses that are permitted in the zoning district." *Id.* at § 11-14-4(B). To receive a special use permit, an applicant must present evidence at a public hearing demonstrating compliance with certain standards, including: "1. The proposed use at the specified location is consistent with the comprehensive plan. 2. The proposed building or use will not diminish the value of adjacent and nearby properties, [and] . . . 5. The proposed building or use will not adversely affect or change the character of the area in which it is located." *Id.* at § 11-14-4(F).

Geneva's Planning and Zoning Commission reviews and makes recommendations on land use matters—including special use permits—prior to final action by City Council. Hearings regarding local planning and zoning issues relating to special use and planned unit development are evidentiary hearings. All evidence in favor of, or against, a land use matter must be submitted in a properly noticed public hearing.

On May 23, 2024, the Planning and Zoning Commission met to consider DRA's special use permit application in a meeting that lasted over three hours and twenty minutes. The Planning and Zoning Commission's staff prepared a report stating its position that DRA's application met the special use standards. Before the public

6

hearing, area residents submitted emails, letters, and supporting documents opposing the proposed cell tower.  Residents also submitted two petitions opposing the application.

At the hearing, approximately a dozen residents spoke in opposition to the special use permit application.  No residents spoke in favor of the application.  Both in written submissions and in-person statements, residents expressed their concerns with the negative visual impact from the Geneva Christina tower.  As required by Geneva Code, DRA representatives conducted a "balloon test" on April 18, 2024.  During this test, a crane with a balloon attached to it was raised to 85 feet at the site of the proposed tower.  The goal of the test was to allow observers to envision the height of the proposed wireless facility.  One resident stated:  "The third and fourth balloon test pictures show the tower is significantly over the sight line and adding an undesirable view by the existing playground and baseball diamond in Eaglebrook Park, where many very young children play.  Clearly visible over the mature tree berm.  These photographs also give a perspective of the visual/character impact to many existing home back yards (that surround the park) that they have enjoyed for many years."  Admin. Rec., dkt. no. 28-16, at 11.

The third photograph referenced by this resident is reproduced below.  Based on the resident's submission, the photograph shows the view of the crane during the balloon test—simulating the view of the proposed tower—from near the playground in Eaglebrook Park.  The crane is visible far above the tree line.

7



The fourth photograph referenced by the resident is reproduced below. According to the resident, the photograph shows the view of the crane from the baseball diamond in Eaglebrook Park. The crane is again visible far above the tree line.



The resident who submitted these photographs stated that they "give a perspective of the visual/character impact to many existing home back yards (that surround the park) that they have enjoyed for many years." *Id.*

Another resident submitted a series of photographs of the balloon test and stated: "These pictures more accurately reflect what the eyes see rather than the zoomed out pictures posted on the City of Geneva Verizon Tower – Randall Road web page." *Id.* at 29. The photograph reproduced below is representative of these photographs and shows a closer view of the crane and balloon from the playground in Eaglebrook Park. Overall, these photographs were submitted to show how the proposed tower would appear from the nearby park, baseball diamond, and residential neighborhood. In all of the photographs, the crane is visable far above the tree line.



A different resident shared concerns about the view of the tower:  "This location relies on the current landscaping to shield the bulk of the base of the tower. As the fifteenth picture in the series shows, the current landscaping is quickly dying off. I am not sure who is responsible for maintaining this area, but at the current rate there will be no landscaping in this area, resulting in a direct view of the tower from any home that surrounds the park." *Id.* at 38.  As best as the Court can tell, the reference to the "current landscaping" involves the trees that appear in the photographs included above. Without these trees, the full tower would be visible to the park and residential neighborhood.

With its application, DRA submitted a property value impact study prepared by Mark Layne, a real estate appraiser/consultant.  Layne's study concluded that "there is no empirical evidence to suggest that proximity to a communications tower has a measurable impact, positive or negative, upon adjacent residential property values." Admin. Rec., dkt. no. 28-2, at 39.

Several residents with real estate experience criticized Layne's methodology during the Planning and Zoning Commission meeting.  A real estate attorney with over thirty years of experience stated that many factors go into home values—including whether they have updated kitchens, modernized bathrooms, and finished basements— but that Layne's study failed to identify those factors, instead focusing only on the sample homes' distance to nearby towers.  He explained that, if these other factors are analyzed, the data shows "cell towers do affect value."  Planning and Zoning Committee Recording at 2:04:47-2:04:55.

A member of the Planning and Zoning Commission—who is also a real estate tax

10

attorney with thirty-six years of experience—stated that Layne's report was unusual in its failure to apply any of the three generally accepted approaches to property valuation. A local real estate agent provided a standard form relied upon by real estate brokers to assess a given property's marketability. Among the factors listed for consideration were "Location on airport flight path," "Location in flood plain," and "Location near/in view of power lines/water towers/radio towers." Admin. Rec., dkt. no. 28-16, at 7. The real estate agent also stated that potential home buyers view cell towers as "red flags" that stigmatize a potential property's interest and value. *Id.* at 5.

Several residents referenced and submitted studies from other areas of the country that discuss cell towers' negative impact on home values. One of these residents stated: "A number of published studies have been conducted on this topic, all of them showing a clear decline in value ranging from 7.6% all the way up to 20% for the homes located closest to cell towers, with that decline starting to dissipate as you move further away from towers." Admin. Rec., dkt. no. 28-17, at 104. Based on data she collected, this resident estimated "[e]ach household within that 700 foot range is likely to lose an average of $68, 875. Each household between 701 feet to .25 miles is likely to lose an average of $26,348. With a total predicted loss of [$]3,292,564." *Id.* at 106.

DRA also submitted with its application a table listing properties within the relevant search ring that could be used as potential sites for the proposed cell tower. Dolan stated that the Geneva Christina site "has unique characteristics of separation from residential, it has the size, and it has the location and that's the only property in the search ring that meets that criteria." Planning and Zoning Committee Recording at

11

23:50-24:04.  Based on the record, the proposed tower is estimated to be 243 feet from the nearest single-family home, and approximately 200 feet from that property's rear property line.  DRA mailed notice to forty-five properties that would be within 500 feet of the tower.

A resident testified that at least two of the sites within Verizon's search ring did not back up to residential properties.  Dolan responded that these locations had other issues that disqualified them, such as being too far south to adequately address the coverage gap.  The chart provided by DRA also showed that multiple properties that were under consideration were further from residences than the Geneva Christina site.  Dolan testified that more homes would be affected by using these sites but did not provide any information to explain this.  Verizon also determined that small cell antennas—which can be placed on existing utility poles and streetlights—would not address the coverage concerns.  DRA did not present data or coverage maps for any other locations or antenna types.

At the end of the meeting, the Planning and Zoning Commission members discussed the evidence presented by DRA and residents.  Specifically, several members noted that they found the presentation by a resident who collected additional property value data from the area and found that there would be a negative impact on home values more persuasive than Layne's report.  A member also relied on resident photographs and statements to determine that the tower did not align with Geneva's comprehensive plan because it would be visible above the tree line from the nearby homes.  The Commission recommended that the City Council deny DRA's special use permit application.

12

At a City Council meeting on August 12, 2024, the full council considered the special use permit application, and DRA made an additional presentation. The City Council members ultimately agreed with the recommendation by the Planning and Zoning Commission. The City Council denied DRA's special use permit application and enacted Resolution No. 2024-81. The resolution provided the following written findings in support of the denial of the special use permit:

A. The City Council adopts and incorporates herein by reference each of the specific reasons and findings set forth in the recommendation for Denial issued by the Planning and Zoning Commission on May 23, 2024.

B. Specifically, the City Council finds that DRA did not present convincing evidence to demonstrate compliance with Special Use Standards 1, 2, and 5:

1. The proposed use at the specified location is consistent with the comprehensive plan.

2. The proposed building or use will not diminish the value of adjacent and nearby properties.

5. The proposed building or use will not adversely affect or change the character of the area in which it is located.

C. The City Council further finds that DRA did not present evidence to substantiate the need [] for a new Cell Tower at the proposed location and did not adequately address why alternative sites or less intrusive alternatives were not pursued.

D. In rendering its decision, the City Council has again specifically excluded from its consideration or reasoning for denial any comments, statements, submissions, or any other materials or information regarding any potential adverse health concerns or effects over radio frequency (RF) emissions, other than to seek certification from TowerNorth that TowerNorth's application complies with applicable federal standards contained in 47 CFR 1.1310.[1]

---

[1] The parties have not addressed why paragraph D of the resolution references TowerNorth rather than DRA. TowerNorth is a different developer who applied for a special use permit to build a cell tower at a different location. It is possible that this resulted from a cut-and-paste error, but there is no way for the Court to know for sure.

13

E. Without limiting any of the foregoing, the City Council's findings are further reinforced and supplemented by the additional non-health related statements, representations and comments received from the public at the public hearing on May 23, 2024, with respect to the adverse aesthetic and visual impacts of proposed Cell Tower which immediately abuts a residential neighborhood, the visual eyesore associated therewith, the adverse impacts on local property values, and DRA's demonstrated failure to explain why alternative sites or less intrusive alternatives were not given stronger consideration.

Am. Comp., Ex. C.

## Discussion

Summary judgment is appropriate if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The burden is on the moving party to demonstrate that no genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In considering a motion for summary judgment, the Court views the facts in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). On cross-motions for summary judgment, the Court draws inferences "in favor of the party against whom the motion under consideration is made." *Cremation Soc'y of Ill., Inc. v. Int'l Bhd. of Teamsters Local 727*, 869 F.3d 610, 616 (7th Cir. 2017) (cleaned up). The Court may not "make credibility determinations" or "weigh the evidence." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Still, to avoid summary judgment, the nonmoving party must identify "specific facts showing that there is a genuine issue for trial" that go

14

beyond a "mere scintilla of evidence." *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018).

## A.    Issue preclusion

Geneva argues that a series of decisions by Judge Rebecca Pallmeyer should bar relegation of various issues in this case via the doctrine of collateral estoppel, or issue preclusion. *See TowerNorth Development, LLC v. City of Geneva*, No. 22 C 4151, 2024 WL 621616 (N.D. Ill. Feb. 14, 2024); *TowerNorth Development, LLC v. City of Geneva*, No. 22 C 4151, 2025 WL 975753 (N.D. Ill. March 31, 2025); *TowerNorth Development, LLC v. City of Geneva*, No. 22 C 4151, 2025 WL 3764865 (N.D. Ill. Dec. 30, 2025). That case involved Geneva's denial of a special use permit application submitted by a different developer concerning a different property.

"Under the doctrine of collateral estoppel, also referred to as issue preclusion, 'once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation.'" *Firishchak v. Holder*, 636 F.3d 305, 308 (7th Cir. 2011) (quoting *Montana v. United States*, 440 U.S. 147, 153 (1979)). For issue preclusion to apply to a particular issue:  "1) the issue sought to be precluded must be the same as that involved in the prior action, 2) the issue must have been actually litigated, 3) the determination of the issue must have been essential to the final judgment, and 4) the party against whom estoppel is invoked must be fully represented in the prior action." *Waagner v. United States*, 971 F.3d 647, 657 (7th Cir. 2020).

Issue preclusion does not apply to any issue in this case. The present dispute involves a different developer, a different property location, a different special use

15

permit application, and a different administrative record.  Although both cases involve Geneva and a potential cell tower that Verizon sought to build, the similarities end there. Judge Pallmeyer's comprehensive decisions are persuasive authority for this Court, but they do not have preclusive effect.

**B.     Substantial evidence**

The TCA requires that "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record."  47 U.S.C. § 332(c)(7)(B)(iii).  "The 'in writing' requirement is met so long as the written decision contains a sufficient explanation of the reasons for the permit denial to allow a reviewing court to evaluate the evidence in the record supporting those reasons."  *Helcher v. Dearborn County*, 595 F.3d 710, 719 (7th Cir. 2010).

Unlike typical summary judgment motions, when a court reviews a regulatory body's decision under a substantial evidence standard, "the 'trial' has already taken place," and a closed factual record already exists.  *Helcher v. Dearborn County*, 500 F. Supp. 2d 1100, 1108 (S.D. Ind. 2007), *aff'd*, 595 F.3d 710 (7th Cir. 2010).  "Essentially, the district court serves in an appellate function [as] the trial of sorts has already occurred through the local board's decision."  *New Cingular Wireless PCS, LLC v. Monroe Cnty. Bd. Of Comm'rs*, 632 F. Supp. 3d 845, 849 (S.D. Ill. 2022).

The substantial evidence standard is the same as that which applies to a federal court's review of federal administrative agencies' decisions.  *Id.* at 723 (citing *PrimeCo Pers. Commc'ns, L.P. v. City of Mequon*, 352 F.3d 1147, 1148 (7th Cir. 2003)).  That is, the local government's decision will be upheld if it is based on "such relevant evidence

16

as a reasonable mind might accept as adequate to support a conclusion." *VoiceStream Minneapolis, Inc. v. St. Croix County*, 342 F.3d 818, 830 (7th Cir. 2003) (quoting *Aegerter v. City of Delafield*, 174 F.3d 886, 889 (7th Cir. 1999)). The court looks to the "evidence in the record support[ing]" Geneva's decision to determine whether it "clearly erred in refusing to issue the permit." *Helcher*, 595 F.3d at 723. The clear-error standard implies "less than a preponderance, but more than a scintilla of evidence." *Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 494 (2d Cir. 1999) (quotations omitted).

The standard is "highly deferential" to the local government. *Helcher*, 595 F.3d at 723 (citing *VoiceStream*, 342 F.3d at 830). Rather than limiting local regulatory power, "[t]he TCA's substantial evidence test is a procedural safeguard which is centrally directed at whether the local zoning authority's decision is consistent with the applicable [local] zoning requirements." *VoiceStream*, 342 F.3d at 830 (quoting *ATC Realty, LLC v. Town of Kingston*, 303 F.3d 91, 94 (1st Cir. 2002)).

### 1. Aesthetic impact

Geneva's zoning code requires a special use permit applicant to demonstrate that the proposed use is consistent with the comprehensive plan and will not adversely affect or change the character of the area in which it is located. The comprehensive plan emphasizes the importance of preserving aesthetics within the city, especially for residential areas and parks. The City Council determined that DRA's special use permit application did not meet these requirements.

"[A]esthetics may constitute a valid basis for denial of a wireless permit if substantial evidence of the visual impact of the tower was before the board."

17

*VoiceStream,* 342 F.3d at 831.  "[G]eneralized expressions of concern with aesthetics," however, "standing alone, cannot serve as substantial evidence on which to base a wireless permit denial."  *Id*.  For example, "[a] blanket opposition to poles" is not sufficient.  *Helcher*, 595 F.3d at 723.  Instead, the aesthetic concerns must be "grounded in the specifics of the case . . . ."  *Id.*

Several Seventh Circuit decisions are instructive.  In *PrimeCo*, the court affirmed summary judgment for a telecommunications provider when "[t]he only 'evidence' bearing on aesthetic considerations was the testimony of three or four residents that they don't like poles in general; they didn't say they would object to a flagpole" in the proposed location.  *PrimeCo*, 352 F.3d at 1150.  The Seventh Circuit reached a different conclusion in *VoiceStream* when it affirmed summary judgment for a local government that had relied on specific evidence.  *VoiceStream*, 342 F.2d at 832.  This evidence included photographs taken from a crane test that showed the tower would "predominate the landscape of the bluff overlooking the Riverway" and testimony from residents who observed the crane test and concluded that the tower would "interfere with the unique scenery" of the area.  *Id*.  In *Helcher*, the court again affirmed the local government's denial of a special use permit based, in part, on photographs that showed the tower would rise far above the tree line and statements from residents who moved to the area "because of the natural views[.]"  *Helcher,* 595 F.3d at 724.

This case is closer to *VoiceStream* and *Helcher* than *PrimeCo.*  Numerous residents presented specific concerns that the proposed tower would have a negative impact on the views from their properties as well as from a nearby park.  For example, one resident stated that "the tower is significantly over the sight line and adding an

18

undesirable view by the existing playground and baseball diamond in Eaglebrook

Park[.]" Admin. Rec., dkt. no., 28-16 at 11. Another resident stated specific concerns

about the landscaping that currently shields part of the tower, highlighting that the pole

would be in direct view of the park and nearby homes if the landscaping were no longer

present. Residents also provided photographs from the balloon test that supported

these concerns. The Planning and Zoning Commission and City Council relied on these

specific concerns—among others—to determine that the proposed 85-foot-tower did not

meet the requirements for a special use permit.

DRA points to the staff report that found that the special use permit application

met all the city's special use standards. But as Geneva points out, the staff report was

prepared before residents, DRA, and Verizon provided additional evidence at the public

hearings. Most importantly, Geneva was not required to accept the conclusions set

forth in the staff report. *TowerNorth*, 2024 WL 621616, at *17 (citing *Helcher*, 595 F.3d

at 715, 724).

For these reasons, the Court concludes that Geneva did not clearly err when it

denied DRA's special use permit application on the ground that the proposed tower

would have a negative aesthetic impact on the surrounding residential area and

community park.

### 2.   Property values

Geneva's zoning code also requires that the proposed use "will not diminish the

value of adjacent and nearby properties." Geneva Code § 11-14-4(B)(2). The City

Council also determined that DRA's special use permit application did not meet this

requirement.

19

A reduction in property values is a detriment to the surrounding community that may support a local government's decision to deny a permit to build a cell tower. *Helcher,* 595 F.3d at 723. But, again, generalized objections that a proposed tower will adversely affect property values cannot support denial of a permit. *VoiceStream Minneapolis, Inc. v. St. Croix County*, 212 F. Supp. 2d 914, 933 (W.D. Wis. 2002), *aff'd*, 342 F.3d 818 (7th Cir. 2010).

Three real estate professionals provided public comments disputing Layne's report, submitted by DRA, which contended that the proposed tower will not impact property values. In his report, Layne stated that "there is no statistically significant difference in property values based upon proximity to the towers within the selected samples." Admin. Rec., dkt. no. 28-2, at 38. Layne thus concluded that "there is no empirical evidence to suggest that proximity to a communications tower has a measurable impact, positive or negative, upon adjacent residential property values." *Id.* at 39. A real estate attorney with over thirty years of experience stated that many factors go into home values—including whether they have updated kitchens, modernized bathrooms, and finished basements—and yet Layne's study failed to identify those factors, instead only focusing on the sample homes' distance to nearby towers. He explained that if these other factors are taken into account, the data shows "cell towers do affect value." Planning and Zoning Commission Recording at 2:04:47-2:04:55. A member of the Planning and Zoning Commission—a real estate tax attorney with thirty-six years of experience—stated that Layne's report was unusual in its failure to apply any of the three generally accepted approaches to property valuation. A local real estate agent provided a standard form commonly relied upon by real estate brokers

20

to assess a given property's marketability. Among the factors listed for consideration were "Location on airport flight path," "Location in flood plain," and "Location near/in view of power lines/water towers/radio towers." Admin. Rec., dkt. no. 28-16, at 7. The real estate agent also stated that potential home buyers view cell towers as "red flags" that stigmatize a potential property's interest and value. *Id.* at 5. The agent noted that a decrease in home value is implied by the inclusion of this item in the aforementioned form. *Id.*

Residents also submitted published studies from other areas of the country that discuss the negative impact cell phone towers can have on property values. For example, one study on home prices in Savannah, Georgia suggests that proximity to cell phone towers can reduce a home's selling price up to 7.6%. Admin. Rec., dkt. 28-17, at 143. Another study analyzed a dataset of residential housing sales from central Kentucky from 2000 to 2011. *Id.* at 175. This study estimates that a property with a visible antenna located 1,000 feet away sells for 1.82% less than a similar property located 4,500 feet away and that the aggregate impact is $10 million for properties located within 1,000 feet. *Id.*

The Planning and Zoning Commission and the City Council ultimately credited the information submitted by residents with substantial real estate expertise as well as other published studies over Layne's report. Based on this evidence, Geneva determined that the proposed tower would have a negative impact on property values and, therefore, did not meet the requirements for a special use permit. This was not clear error.

21

### 3. Other evidence

Geneva puts forth two additional arguments in support of its denial of DRA's special use permit application. First, Geneva argues that the proposed tower is not consistent with the city's comprehensive plan. Second, it argues that DRA failed to present evidence to substantiate the need for the tower at the Geneva Christina location rather than at an alternative site or through other available cellular technology such as small cell antennas. The first argument relates to the proposed tower's aesthetic impact; the Court has already addressed the point. The second argument falls within the analysis of the effective prohibition count; the Court discusses it below.

For these reasons, the Court grants summary judgment in favor of Geneva on count one.

## C. Effective prohibition

The Court now turns to DRA's claim that Geneva effectively prohibited the provision of personal wireless service—in violation of the TCA, 47 U.S.C. § 332(c)(7)(B)(i)(II)—when it denied DRA's special use permit application. Unlike the substantial evidence standard, "[w]hether a particular zoning decision violates the TCA's anti-prohibition clause is a question 'that a federal district court determines in the first instance without any deference to the [local zoning] board.'" *VoiceStream*, 342 F.3d at 833 (quoting *Nat'l Tower, LLC v. Plainville Zoning Bd. of Appeals*, 297 F.3d 14, 22 (1st Cir. 2002)); *see also Cellco P'ship v. White Deer Twp. Zoning Hearing Bd.*, 74 F.4th 96, 106 (3d Cir. 2023) ("[A] local zoning board decision [being] based on bona fide local zoning concerns or [being] lawful under state law tells us nothing about whether it has 'the effect of prohibiting personal wireless services.'").

22

### 1.    Applicable legal standard

The parties dispute the applicable legal standard that the Court must apply when determining whether Geneva's denial of DRA's special use permit application violated the TCA.  DRA argues that the Court should apply the "materially inhibits" standard adopted by the Federal Communications Commission (FCC) in 2018.  Geneva responds that the Seventh Circuit's "likely to be fruitless" standard applies.

In *VoiceStream*, decided in 2003, the Seventh Circuit adopted a two part analysis for determining whether a local government action effectively prohibited personal wireless service:   (1) the service provider must show that its proposed facility will close a "significant gap" in coverage; and (2) the provider carries the "heavy" burden to show "not just that this application has been rejected but that further reasonable efforts are so likely to be fruitless that it is a waste of time even to try."  *VoiceStream*, 342 F.3d at 834.  The court affirmed this standard in *Helcher*, decided in 2010.

In 2018, the FCC issued a Declaratory Ruling and Order interpreting Section 332(c)(7)'s anti-prohibition clause and announcing a more relaxed standard as a way of "remov[ing] regulatory barriers that would unlawfully inhibit the deployment of infrastructure necessary to support" new wireless services known as 5G.  *In the Matter of Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment*, 33 F.C.C.R. 9088, ¶ 1 (2018).  The FCC rejected the "likely to be fruitless" standard adopted by the First, Fourth, and Seventh Circuits as well as the "least intrusive means" standard adopted by the Second, Third, and Ninth Circuits, and instead adopted a "materially inhibits" standard.  *Id.* at n.75, ¶ 35.

 Likely recognizing that the FCC's order is no longer entitled to *Chevron*

23

deference, DRA instead argues that the FCC's adoption of the "materially inhibits" standard remains entitled to "great weight" and "respect" under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). Pl.'s Mem. of L. at 11 (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024)). But *Skidmore* does not permit the Court to follow an agency interpretation when it conflicts with binding Seventh Circuit law.

DRA also argues that "[d]istrict courts may depart from circuit precedent, including *VoiceStream*, where 'events subsequent' to that precedent—including 'an intervening regulation'—show that the appellate court would abandon its precedent when given the opportunity to do so." Pl.'s Resp. and Reply at 13 (quoting *Olson v. Paine, Webber, Jackson & Curtis, Inc.*, 806 F.2d 731, 734 (7th Cir. 1986)). DRA contends that "[t]he 2018 FCC Order is just such an intervening regulation." *Id.* But this argument relies on *Chevron* deference, which is no longer operative. *See Rush Univ. Med. Ctr. v. Burwell*, 763 F.3d 754, 762 (7th Cir. 2014). After *Loper Bright*, the Court must follow the governing law in this Circuit, even if an intervening agency action conflicts with it. *Loper Bright*, 603 U.S. at 392 ("Section 706 makes clear that agency interpretations of statutes—like agency interpretations of the Constitution— are *not* entitled to deference.").

In short, this Court is bound by Seventh Circuit law. To establish that Geneva violated the TCA by effectively prohibiting personal wireless service, DRA must show: (1) that the proposed facility will close a "significant gap" in coverage; and (2) "not just that this application has been rejected but that further reasonable efforts are so likely to be fruitless that it is a waste of time even to try." *VoiceStream*, 342 F.3d at 834.

24

## 2. Significant gap in coverage

"In order to establish a violation of the TCA's anti-prohibition clause, the service provider must first show that its proposed facility will close a 'significant gap' in coverage." *VoiceStream,* 342 F.3d at n.7. Geneva argues that DRA incorrectly relies on out-of-circuit cases to address what constitutes a significant gap in coverage. According to Geneva, "the relevant inquiry is: 'Does the denial of a permit for a particular site have the effect of prohibiting wireless services?'" Def.'s Reply at 14 (quoting *VoiceStream*, 342 F.3d at 834 n. 8). Although this is the relevant question for the second step of the effective prohibition analysis, it does not govern the first step, the significant gap inquiry.

The Seventh Circuit has not addressed what constitutes a significant gap in coverage. *VoiceStream*, 342 F.3d at 834 n. 7 (explaining that the court did not need to consider what constitutes a significant gap in coverage because the issue was undisputed). Most circuits evaluate whether an individual provider has a significant gap in its coverage. *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 39 (1st Cir. 2014); *T-Mobile Cent., LLC v. Charter Township of West Bloomfield*, 691 F.3d 794, 806 (6th Cir. 2012); *MetroPCS, Inc. v. City & County of San Francisco*, 400 F.3d 715, 733 (9th Cir. 2005), abrogated on other grounds by *T-Mobile S., LLC v. City of Roswell*, 574 U.S. 293, 299 (2015). In the Fourth Circuit, however, a substantial gap exists only if no provider offers coverage in the relevant area. *T-Mobile Ne. LLC v. Fairfax Cnty. Bd. of Sup'rs*, 672 F.3d 259, 268 (4th Cir. 2012).

The Court finds persuasive the decisions requiring evaluation of the substantial gap question from the particular provider's prospective. As the Sixth Circuit explained:

25

"From the perspective of a customer who has poor coverage with T–Mobile in a certain area, it is little consolation that another provider, Verizon for example, may have good service in the same area." *T-Mobile Cent.*, 691 F.3d at 807.

This still leaves the question of what factors the Court should consider when determining whether there is a significant gap in coverage. The First Circuit has identified several relevant factors. These include the physical size of the gap, the area in which there is a gap, the number of users the gap affects, whether all the carrier's users in that area are similarly affected by the gaps, and data about percentages of unsuccessful calls or inadequate service during calls in the gap area. *Omnipoint Holdings, Inc. v. City of Cranston*, 586 F.3d 38, 49 (1st Cir. 2009). The Seventh Circuit expressly joined the First Circuit in adopting the "likely to be fruitless" standard to determine whether a local governmental action effectively prohibits personal wireless service. *VoiceStream*, 342 F.3d at 834; *Helcher*, 595 F.3d at 728. The Court, therefore, will evaluate whether a significant gap in coverage exists using the factors identified by the First Circuit.

DRA points to attestations from a Verizon radio frequency engineer that Verizon has severe capacity issues in the relevant area. The engineer also attested that Verizon uses key performance indicators (KPIs) to measure system failures and dropped calls. In 2024, the KPI target for dropped calls was 0.5 percent, or no more than five dropped calls out of every 1,000. For blocked calls, Verizon's target was 0.3 percent, meaning that no more than three attempts out of every 1,000 should be blocked or unable to access the wireless network. According to the engineer, the relevant area has failed to meet Verizon's KPI targets for dropped and blocked calls

26

over 90% of the time. He also said that the average number of daily calls blocked by system issues was 1,661 and the average number of daily dropped calls was 1,033. DRA states that, although 911 emergency calls are given priority in the call system, these calls may be dropped or blocked if there is no coverage or if capacity is exceeded. Geneva points out that DRA did supply any evidence that 911 calls were dropped or blocked in the area. Geneva also relies on public comments from residents that stated they did not suffer any dropped calls or other service interruption issues. Although Geneva's evidence is arguably thin, on summary judgment the Court cannot appropriately weigh the evidence. The Court therefore concludes that Geneva has put forth enough evidence to create a genuine factual dispute.

### 3.    Other viable options

In addition to showing a significant gap in coverage, "a provider carries a heavy burden of demonstrating not just that the application has been rejected but that further reasonable efforts are so likely to be fruitless that it is a waste of time even to try." *Helcher*, 595 F.3d at 728. "Under this standard, the provider must show that its existing application is the only feasible plan and that there are no other potential solutions to the purported problem." *VoiceStream*, 342 F.3d at 834. "[S]o long as the service provider has not investigated thoroughly the possibility of other viable alternatives, the denial of an individual permit does not 'prohibit or have the effect of prohibiting the provision of personal wireless services.'" *Id.* at 834–35 (quoting 47 U.S.C. § 332(c)(7)(B)(i)(II)).

DRA submitted a written report to Geneva that explained—to some extent—why certain locations and other solutions were not available to resolve the coverage gap. The report included a short comment on the "viability" of each property such as "pond

behind building", "not enough space", "271 feet from residential", "parking lot is not large enough", "zoned residential".  Dkt. no. 28-2 at 25.  The report also included a short explanation of why other alternative facility options are not viable, such as "Co-location on 'combined wireless communication facility'? There are no existing combined wireless communication facilities in the search area."  *Id.* at 26.  In addition, the Verizon engineer attested that small cell antennas are not a feasible solution for the coverage gap because it would still result in poor network performance.

Geneva points to DRA's instruction to its contractor—who was hired to search for potential sites—that no further research was required once the contractor found a property with an interested owner and decent zoning prospects.  The city also notes that there is no evidence that DRA contacted the owners of other properties that were identified as potential sites after it received a positive response from the Geneva Christina property's owner.  DRA's summary of potential properties also shows numerous other properties that are further from homes than the Geneva Christina property, but there is no further explanation of why these properties are not viable alternative sites.

At this point, there is not enough evidence in the record to determine whether further reasonable efforts by DRA to identify a viable alternative site for the wireless tower were so likely to be fruitless that it was a waste of time to even try.  The Court concludes that a genuine factual dispute exists on this issue.  For these reasons, the Court denies both parties' motions for summary judgment on count two.

### Conclusion

For the reasons stated above, the Court grants Geneva's motion for summary

28

judgment on count 1 [dkt. no. 49] and denies it on count 2.  The Court denies DRA's

motion for summary judgment [dkt. no. 44].  The case is set for a telephonic status

hearing on May 12, 2026 at 9:00 a.m. for the purpose of setting a prompt trial date.  The

following call-in number will be used:  650-479-3207, access code 2305-915-8729.

Date:  May 5, 2026

_____
MATTHEW F. KENNELLY
United States District Judge