**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DRA PROPERTIES, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 24 C 8285** |
| | ) | |
| **CITY OF GENEVA, ILLINOIS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

MATTHEW F. KENNELLY, District Judge:

DRA Properties, LLC has sued the City of Geneva, Illinois, alleging that it violated two provisions of the Telecommunications Act of 1996 (TCA) when it denied DRA's special use permit application. The special use permit would allow DRA to construct an 85-foot-tall cell tower on a parcel of land referred to by the parties as the "Geneva Christina" site. DRA seeks a declaratory judgment that Geneva's denial of the special use permit application was not supported by substantial evidence in violation of 47 U.S.C. § 332(c)(7)(B)(iii) (count 1) and had the effect of prohibiting the provision of personal wireless services in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II) (count 2). DRA also seeks an injunction or writ of mandamus compelling Geneva to grant the special use permit and all other necessary permits.

On May 5, 2026, the Court granted summary judgment in Geneva's favor on count 1. *DRA Props., LLC v. City of Geneva*, No. 24 C 8285, 2026 WL 1229967, at *10 (N.D. Ill. May 5, 2026). On July 20, 2026, the Court conducted a bench trial on count 2. This decision constitutes the Court's findings of fact and conclusions of law under

Federal Rule of Civil Procedure 52(a)(1).

**A. Facts**

DRA develops, owns, and leases wireless communications facilities in Illinois and elsewhere in the country. Geneva is located in Kane County, Illinois, a little under forty miles west of downtown Chicago. It has a population of approximately 21,000 and is bordered on the west by unincorporated land in Kane County, on the north by St. Charles, on the east by West Chicago, and on the south by Batavia.

DRA finds properties for wireless providers, including Verizon, to lease. DRA also constructs towers and other wireless facilities that allow wireless providers to create and maintain a network of cell sites. To provide reliable service, Verizon must have a network of cell sites that overlap in a grid pattern. As a Verizon user travels through the network, the user's mobile device constantly measures the signal from the nearest site, and if the network determines that a neighboring site will provide a stronger reliable signal, the call is handed off to the neighboring site. A dominant server is the strongest signal provided by a server site and is needed to provide reliable signal to a user's device. A base station is a macro tower—a larger tower that provides broader coverage to users and operates at full power—that controls the signal for Verizon users. Wireless cellular signal can be obstructed by terrain, buildings, trees, and other similar obstacles.

Verizon radio frequency engineers and systems performance engineers evaluate key performance indicators, or KPIs, to identify areas where Verizon needs to improve the network. To evaluate KPIs, the engineers pull data showing the number of dropped calls and access failures in a particular area. A "dropped call" occurs when a Verizon

user's call is disconnected because of a service failure. A "blocked call" occurs when a Verizon user is unable to connect a call due to lack of service.

Jessie McDaniel—a Verizon radio frequency engineer—testified regarding the gap in coverage that Verizon determined existed in Geneva. To support his testimony, McDaniel discussed several graphs that showed the coverage issues. In 2024, the KPI target for dropped calls was 0.5 percent, meaning no more than five dropped calls out of every 1,000. For blocked calls, Verizon's target was 0.3 percent, meaning no more than three attempts out of every 1,000 should be blocked or unable to access the wireless network. From June 2023 through June 2024, the relevant area failed to meet Verizon's KPI targets for dropped and blocked calls over 90 percent of the time. In raw numbers, this means that Verizon users in the relevant area of Geneva collectively suffered, on average, 1,033 dropped calls and 1,661 blocked calls per day. McDaniel also presented data showing the current gap in coverage for reliable "in-vehicle" and "in-residence" coverage. McDaniel explained that "in-residence" coverage means that the signal is strong enough to penetrate the walls of a home to provide service, and "in-vehicle" means the same for vehicles.

McDaniel further testified that he has worked on various small cell deployments on Verizon's network. A small cell is a device that can be attached to other City infrastructure, such as a street lamp or electrical pole, that operates at lower power. As a result, the small cell covers a smaller area than a macro tower and is a more localized coverage and capacity option. In McDaniel's opinion, a small cell deployment could not replicate a macro tower because it would not cover the same area, is shorter in height and thus would be affected by obstructions, and has more limited electrical power

capabilities. McDaniel opined that the proposed 85-foot macro tower is needed to ensure that Verizon's customers have adequate wireless cellular service.

Based on this data, the Verizon engineers created a search ring within which a site was needed to remedy the gaps in service in Geneva. The search ring is depicted in plaintiff's exhibit 34:




In 2017, Verizon engaged Dolan Realty Advisors to search for a solution to its asserted coverage gap. DRA's president, Doug Dolan, owns DRA and Dolan Realty Advisors. Dolan evaluated properties in the search ring for potential sites for the proposed macro tower. During his testimony, Dolan explained that he focused on the commercial district and that he considered property owned by the City of Geneva as

well as private property. He narrowed down his search to sites that were large enough to support a cell tower. In 2017, he found that the Shoppes at Randall Square fit the required criteria. Dolan contacted the leasing agent for the owner of that property and expressed interest in leasing space for a new cell site for Verizon. DRA eventually submitted a proposal, and it was preliminarily accepted. In 2019, however, the leasing agent stopped responding to Dolan's outreach. Dolan reached out several times over email in the spring of 2019 but received no response.

Based on the apparent lack of interest from the Shoppes at Randall Square, Dolan began searching for other viable properties for the proposed tower. In 2019, Dolan engaged a contractor, Paul Sileo, to help evaluate the options. Dolan and Sileo met and identified ten properties within the search ring that might be viable candidates. Sileo informed Dolan that he found contact information for five of the property owners and could send them letters. On July 8, 2019, Dolan instructed Sileo: "When you come across one interested candidate with decent zoning prospects, we can stop the research side and try and get [a] business term agreement with this candidate." Pl.'s Ex. 16. Dolan also noted in a July 18, 2019 email to Gaurav Parikh, a Verizon engineering consultant, that DRA was "contacting each and every property owner in the search ring, in conjunction with input from planning director." Pl.'s Ex. 15.

During his testimony, Dolan recalled that, eventually, DRA reached out to all ten candidates. Two properties were ruled out because they were in a flood plain, six of the owners did not respond to outreach from Dolan and Sileo, and three owners responded. Two of the owners who responded turned town the proposal based on the space that the tower would require. The final property owner who responded owned the site at

issue in this case which, as indicated earlier, the parties refer to as Geneva Christina. The owner expressed interest in leasing the property for the proposed tower. The Court notes that Dolan's recollection of the outcome of his outreach adds up to eleven properties that DRA evaluated, not ten. The reason for this disconnect is not clear from Dolan's testimony.

Dolan also identified a Walmart property at the far southern tip of the search ring, immediately south of Fabyan Parkway, as a potential site. Dolan emailed McDaniel asking him to evaluate the Walmart location. McDaniel stated in his email that this site was closer than he would prefer to the existing site to the south "(almost too close)," but he did not want to completely rule it out. Pl.'s Ex. 31. McDaniel further explained in his July 2021 email that the Walmart location "will help offload traffic on our site to the south but it will not help completely offload traffic on the site to the north." *Id.* At trial, McDaniel testified that he was not aware of any location for another tower in the north that would be available for a second tower to offload traffic in that area. McDaniel further testified that he likely wanted to take a second look at the site before ruling it out. But if a site is too close to another tower, the signals overlap, and this degrades the signal quality because there are too many signals in the same frequency in the same area. Dolan testified that he had a conference call with Verizon engineers, including McDaniel, to evaluate the Walmart site, but the engineers said the Walmart site would not achieve Verizon's coverage objectives.

McDaniel also testified that there was an American Tower Company (ATC) tower just outside the search ring to the southwest. McDaniel stated that the ATC tower would not address Verizon's coverage and capacity objectives because it was too far

away from the areas that Verizon was trying to cover.

DRA initially submitted a special use application for the Geneva Christina location in 2020 but withdrew the application after Geneva's Planning and Zoning Commission recommended that the City Council deny the application. After withdrawing the application, Dolan noted that DRA planned to re-file once it "re-certif[ied] why other sites are less desirable to the network and to the City." Pl.'s Ex. 22. Dolan met with Geneva's Planning and Zoning Commission staff to inquire whether they had identified any alternative sites that would be preferable for the proposed tower. According to Dolan, Geneva employees asked him to investigate another site on Randall Road. Dolan performed a site walk and contacted the property owner, but the owner did not accept DRA's proposal because it was not willing to give up any parking space.

Dolan testified, in summary, that DRA evaluated all sixty-five properties in the search ring and that Geneva Christina was the only property with enough space for the proposed tower and a property owner who was willing to lease the property for the tower. Dolan testified that he worked closely with Geneva's Planning and Zoning Commission staff to modify the original proposal for Geneva Christina's special use application to make it more acceptable to residents. As a result, Dolan shifted the tower site away from the area closest to homes and moved it to a trash dumpster area behind a commercial building that was further from the residential area. This shift is depicted below.




Pl.'s Ex. 30. Dolan also explained that, in response to resident concerns, DRA agreed to install a brick enclosure around the tower, lower the tower height from 100 to 85 feet, and make it a "stealth" tower—built to look like a flagpole and conceal the antennas—rather than a traditional tower with exposed antennas.

DRA submitted a new special use permit application on October 3, 2023 seeking permission to build an 85-foot wireless service tower on the Geneva Christina property. At a City Council meeting on August 12, 2024, the full council considered the special use permit application. The City Council denied DRA's special use permit application and enacted Resolution No. 2024-81. The resolution provided the following written findings in support of the denial of the special use permit:

> A. The City Council adopts and incorporates herein by reference each of the specific reasons and findings set forth in the recommendation for Denial issued by the Planning and Zoning Commission on May 23, 2024.
>
> B. Specifically, the City Council finds that DRA did not present convincing evidence to demonstrate compliance with Special Use Standards 1, 2, and

5:

> 1. The proposed use at the specified location is consistent with the comprehensive plan.
>
> 2. The proposed building or use will not diminish the value of adjacent and nearby properties.
>
> 5. The proposed building or use will not adversely affect or change the character of the area in which it is located.

C. The City Council further finds that DRA did not present evidence to substantiate the need [] for a new Cell Tower at the proposed location and did not adequately address why alternative sites or less intrusive alternatives were not pursued.

D. In rendering its decision, the City Council has again specifically excluded from its consideration or reasoning for denial any comments, statements, submissions, or any other materials or information regarding any potential adverse health concerns or effects over radio frequency (RF) emissions, other than to seek certification from TowerNorth that TowerNorth's application complies with applicable federal standards contained in 47 CFR 1.1310.[1]

E. Without limiting any of the foregoing, the City Council's findings are further reinforced and supplemented by the additional non-health related statements, representations and comments received from the public at the public hearing on May 23, 2024, with respect to the adverse aesthetic and visual impacts of proposed Cell Tower which immediately abuts a residential neighborhood, the visual eyesore associated therewith, the adverse impacts on local property values, and DRA's demonstrated failure to explain why alternative sites or less intrusive alternatives were not given stronger consideration.

Pl.'s Ex. 37.

## B. Discussion

The question remaining before the Court is whether Geneva effectively prohibited

[1] The parties have not addressed why paragraph D of the resolution references TowerNorth rather than DRA. TowerNorth is a different developer that applied for a special use permit to build a cell tower at a different location. There is a decent chance that this resulted from a cut-and-paste error, but there is no way for the Court to know for sure.

the provision of personal wireless service—in violation of the TCA's anti-prohibition clause, 47 U.S.C. § 332(c)(7)(B)(i)(II)—when it denied DRA's special use permit application for the Geneva Christina site. The anti-prohibition clause states: "The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof . . . shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II).

"Whether a particular zoning decision violates the TCA's anti-prohibition clause is a question 'that a federal district court determines in the first instance without any deference to the [local zoning] board.'" *VoiceStream Minneapolis, Inc. v. St. Croix County*, 342 F.3d 818, 833 (7th Cir. 2003) (quoting *Nat'l Tower, LLC v. Plainville Zoning Bd. of Appeals*, 297 F.3d 14, 22 (1st Cir. 2002)); *see also Cellco P'ship v. White Deer Twp. Zoning Hearing Bd.*, 74 F.4th 96, 106 (3d Cir. 2023) ("[A] local zoning board decision [being] based on bona fide local zoning concerns or [being] lawful under state law tells us nothing about whether it has 'the effect of prohibiting personal wireless services.'" (quoting 47 U.S.C. § 332(c)(7)(B)(i)(II))).

To establish that Geneva violated the TCA by effectively prohibiting personal wireless service, DRA must show: (1) that the proposed facility will close a "significant gap" in coverage; and (2) "not just that this application has been rejected but that further reasonable efforts are so likely to be fruitless that it is a waste of time even to try." *VoiceStream*, 342 F.3d at 834. When evaluating these questions, the court may "require evidence to be presented in court that is outside of the administrative record compiled by the local authority." *Id.* at 833. Because this is a civil case, DRA must

prove its claim by a preponderance of the evidence. *Burdett v. Miller*, 957 F.2d 1375, 1382 (7th Cir. 1992).

**1. Significant gap in coverage**

"In order to establish a violation of the TCA's anti-prohibition clause, the service provider must first show that its proposed facility will close a 'significant gap' in coverage." *VoiceStream,* 342 F.3d at 834 n.7. The Seventh Circuit has not addressed what constitutes a significant gap in coverage. *Id.* (explaining that the court did not need to consider what constitutes a significant gap in coverage because the issue was undisputed). Most circuits evaluate whether an individual provider has a significant gap in its coverage. *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 39 (1st Cir. 2014); *T-Mobile Cent., LLC v. Charter Twp. of W. Bloomfield*, 691 F.3d 794, 806 (6th Cir. 2012); *MetroPCS, Inc. v. City & County of San Francisco*, 400 F.3d 715, 733 (9th Cir. 2005), *abrogated on other grounds by T-Mobile S., LLC v. City of Roswell*, 574 U.S. 293, 299 (2015). In the Fourth Circuit, however, a substantial gap exists only if no provider offers coverage in the relevant area. *T-Mobile Ne. LLC v. Fairfax Cnty. Bd. of Sup'rs*, 672 F.3d 259, 268 (4th Cir. 2012).

The Court finds persuasive the decisions requiring evaluation of the substantial gap question from the particular provider's prospective. As the Sixth Circuit explained: "From the perspective of a customer who has poor coverage with T–Mobile in a certain area, it is little consolation that another provider, Verizon for example, may have good service in the same area." *T-Mobile Cent.*, 691 F.3d at 807.

The First Circuit has identified several relevant factors to guide the court in assessing whether a significant gap in coverage exists. These factors include: the

physical size of the gap, the area in which there is a gap, the number of users the gap affects, whether all of the carrier's users in that area are similarly affected by the gaps, and data about percentages of unsuccessful calls or inadequate service during calls in the gap area. *Omnipoint Holdings, Inc. v. City of Cranston*, 586 F.3d 38, 49 (1st Cir. 2009). The Seventh Circuit expressly joined the First Circuit in adopting the "likely to be fruitless" standard to determine whether a local governmental action effectively prohibits personal wireless service. *VoiceStream*, 342 F.3d at 834; *Helcher v. Dearborn County*, 595 F.3d 710, 727 (7th Cir. 2010). The Court, therefore, will evaluate whether a significant gap in coverage exists using the factors identified by the First Circuit.

At trial, Jessie McDaniel—a Verizon radio frequency engineer—testified about the gap in coverage Verizon determined existed in Geneva. In support of his testimony, McDaniel discussed several metrics that Verizon used to access coverage issues. From June 2023 through June 2024, the relevant area failed to meet Verizon's KPI targets for dropped and blocked calls over 90 percent of the time. In raw numbers, this means that Verizon users collectively suffered 1,033 dropped calls and 1,661 blocked calls per day, on average.

McDaniel also presented maps showing the current gap in coverage for reliable "in-vehicle" and "in-residence" coverage. McDaniel explained that "in-residence" coverage means that the signal is strong enough to penetrate the walls of a home to provide service, and "in-vehicle" means the same for vehicles. According to the maps McDaniel presented, Verizon users currently experience limited or no "in-residence" and "in-vehicle" coverage in an area that spans at least a half a mile radius. The maps also show that additional coverage within the search ring would address this gap in

coverage.

The only evidence Geneva presented to rebut McDaniel's testimony was testimony by David DeGroot, Geneva's Director of Community Development. DeGroot testified that there were no reports of dropped calls from citizens and that he was unaware of any issues with dropped 911 calls. In the Court's view, this is insufficient to rebut DRA's evidence that a significant gap in coverage exists. In particular, Geneva presented no evidence that it tracked these types of issues with 911 calls, and there is no reason to believe that residents would report cell phone coverage issues to the City, as opposed to their wireless carriers. And 911 calls are likely a very small subset of calls that are placed on cell phones. Thus the Court concludes that DRA has met its burden to show that a significant gap in Verizon's wireless network coverage exists in the search ring depicted in plaintiff's exhibit 34.

**2. Other viable options**

In addition to showing a significant gap in coverage, "a provider carries a heavy burden of demonstrating not just that the application has been rejected but that further reasonable efforts are so likely to be fruitless that it is a waste of time even to try." *Helcher*, 595 F.3d at 728. "Under this standard, the provider must show that its existing application is the only feasible plan and that there are no other potential solutions to the purported problem." *VoiceStream*, 342 F.3d at 834. "[S]o long as the service provider has not investigated thoroughly the possibility of other viable alternatives, the denial of an individual permit does not 'prohibit or have the effect of prohibiting the provision of personal wireless services.'" *Id.* at 834–35 (quoting 47 U.S.C. § 332(c)(7)(B)(i)(II)).

The effective prohibition statute "is a deliberate compromise between two

competing aims—to facilitate nationally the growth of wireless telephone service and to maintain substantial local control over siting of towers." *Town of Amherst v. Omnipoint Commc'ns Enters., Inc.*, 173 F.3d 9, 13 (1st Cir. 1999). "The underlying question is whether, under the facts of a case, a zoning decision effectively prohibited providing wireless service." *Omnipoint Holdings*, 586 F.3d at 51. This question requires the Court to weigh "the carrier's desire to efficiently provide quality service to customers and local governments' primary authority to regulate land use." *Id.* "A carrier 'may think . . . its solution is best,' but, 'subject to an outer limit, such choices are just what Congress reserved to the town' in § 332(c)(7)." *Id.* (quoting *Town of Amherst*, 173 F.3d at 15). "The burden is on the carrier to prove it 'investigated thoroughly the possibility of other viable alternatives' before concluding no other feasible plan was available." *Id.* at 52 (quoting *VoiceStream*, 342 F.3d at 834–35).

Geneva points to a chart submitted with DRA's special use permit as the only documentary evidence in this case that addresses DRA's efforts to investigate viable alternatives. But the Court is not limited to the information in the administrative record. *VoiceStream*, 342 F.3d at 833. DRA provided significant additional evidence on its efforts in the form of testimony from McDaniel and Dolan. The Court considers all evidence admitted at trial when considering whether DRA thoroughly investigated other viable alternatives before determining that no other feasible alternative exists.

**a. Small cell facilities**

Geneva's zoning ordinance states that the most preferable wireless siting option is the use of small cell facilities. DRA contends that small cell facilities are not a viable option to address Verizon's significant coverage gap because they would not provide

reliable signal.

McDaniel testified that Verizon would need to install approximately twenty small cell facilities to replicate the coverage that would be provided by the proposed 85-foot macro tower. Even then, McDaniel testified, the small cell facilities would not replicate the macro tower because the signal would be affected by obstructions, and there would be electrical power issues because the small cell facilities have lower power capabilities. In McDaniel's opinion, the installation of small cell facilities is not a feasible alternative to a macro tower in the Geneva search ring because it would not address the significant gap in coverage. The Court found this testimony persuasive. The Court concludes that DRA has established that small cell facilities are not a viable option to address the gap in coverage.

**b. Other preferred sites**

Geneva's zoning ordinance also identifies additional preferred wireless siting options: replacement of an existing wireless communication facility, an antenna on a base station, using city-owned property, and co-location or combined wireless communication facilities.

McDaniel and Dolan testified that there were no existing wireless communication facilities in the search ring that could be used. Dolan also testified that there were no options for antennas on a base station and that there were no agricultural or industrial properties within the search ring. Dolan further testified that he considered several city-owned properties as candidates. These properties included a storm water retention pond, a city park, a lake, and a fire station. The search ring map and zoning map admitted at trial support this testimony. The Court found this testimony persuasive. It is

common sense that these properties are not viable sites for the proposed tower.

Geneva contends that co-location on an existing tower was a viable option with respect to the tower owned by ATC. Dolan testified that he submitted the ATC tower as a potential site because it is common practice to identify the closest co-location opportunity. But the ATC tower was just outside the search ring, and McDaniel testified that it would not address Verizon's significant gap in coverage. This testimony was persuasive. Based on McDaniel's testimony and a review of the search ring, the Court concludes that DRA has established that the ATC tower is not a viable option to address Verizon's gap in coverage.

**c. Private property**

Dolan explained that he also evaluated private property within the search ring that could be a viable option for placement of the proposed tower. Geneva focuses on two options that it contends were viable alternatives but that it contends DRA failed to fully investigate: the Shoppes at Randall Square, and the Walmart property. Geneva also contends that, after DRA identified the Geneva Christina site as a possible site, it failed to fully investigate any other private properties in the search ring that may be viable options.

**i. The Shoppes at Randall Square**

Geneva argues that the Shoppes at Randall Square was a viable alternative site for the cell tower. DRA contends that this property was not a viable site because the leasing agent for the property stopped responding to Dolan's outreach.

In 2017, Dolan determined that the Shoppes at Randall Square was a viable location for the proposed tower because it was in a business zoning district and the

landlord appeared willing to enter into a lease. In 2018, Dolan exchanged emails with the leasing agent for the property. The leasing agent noted that he would take the proposal to the partners and was trying to get an answer. In May 2019, Dolan followed up with the leasing agent in three emails seeking an update on the conversations but did not receive any response. At this point, Dolan concluded that the owner of the property was not interested and considered the site no longer viable. By July 2019, Dolan began a new search for additional candidates for the cell tower site.

Geneva argued during closing arguments that DRA should have made reasonable follow-up efforts with the owner of the Shoppes at Randall Square based on how many years had passed since the rejection. But nothing in the TCA, or the case law interpreting it, requires a wireless provider to continue to follow-up after a property owner has definitively informed the provider that it is not interested in leasing the property for a cell site. The Court concludes DRA has shown it investigated thoroughly the Shoppes at Randall Square property based on several outreach attempts that went unanswered. Given the efforts that DRA made, no further investigation was necessary. The record reflects that further efforts would not have made a difference.

**ii. Walmart**

Geneva also points to a Walmart property at the southern end of the search ring as a possible location for the proposed tower. *See* Pl.'s Ex. 31 at 2. DRA contends that the Walmart location is not viable because it would not meet Verizon's objectives.

The Court cannot appropriately require Geneva to accept a wireless tower on the basis that the wireless carrier views a single tower as the optimal option. *Omnipoint Holdings*, 586 F.3d at 51 ("A carrier 'may think . . . its solution is best,' but, 'subject to an

outer limit, such choices are just what Congress reserved to the town' in § 332(c)(7)." (quoting *Town of Amherst*, 173 F.3d at 15)). In *VoiceStream*, the Seventh Circuit found that the provider "failed to meet its heavy burden of showing that its proposal to build a 185-foot tower on the Haase property is the only feasible plan for closing the gap in its coverage . . . ." *VoiceStream*, 342 F.3d at 835. The court explained that there was no evidence in the record to indicate that the provider "made a significant effort to investigate any multiple-tower alternatives . . . ." *Id.* The court further noted that the provider's "conclusory statements that multiple-tower alternatives are not feasible are insufficient to prove" that the local government's denial of its application "prohibit[s] or ha[s] the effect of prohibiting the provision of personal wireless services." *Id.*

The evidence before the Court is insufficient to establish that DRA investigated thoroughly whether the Walmart site, plus another site to the north, would address the gap in coverage. McDaniel's contemporaneous email related to the Walmart site—in July 2021—stated that it was "closer than [he] would like it to be to [Verizon's] existing site to the south (almost too close)." Pl.'s Ex. 31. He went on to explain that the location "will help offload traffic on our site to the south but it will not completely offload traffic on the site to the north. Therefore we will probably need another site in the area to the north." *Id.* By contrast, he viewed the Geneva Christina site as "perfectly located." *Id.* With regard to what might be considered the Walmart-plus-one alternative, McDaniel did not provide any additional analysis on the feasibility of an additional site at or near the northern portion of the search ring in 2021 or during his testimony. He testified that his initial thinking at the time was that the Walmart location was too close to an existing Verizon tower, which could cause an overlap and resulting

interference that would degrade the signal quality, and he repeated that view at trial. But he did not try to quantify this—for example, how much degrading?—and in any event it appears that McDaniel did no further analysis either at the time or prior to trial regarding whether a Walmart-plus-one alternative was feasible. Rather, that analysis appears to have stopped once the Geneva Christina site was decided upon.

As the Court has indicated, the law does not require Geneva to allow a tower based on Verizon's preferred outcome. Instead, it imposes a burden on a provider to show that it investigated other feasible alternative to the point that any further efforts would be a waste of time. This includes the use of multiple towers instead of a single tower, if feasible. McDaniel's contemporaneous emails and testimony at trial do not establish that Verizon thoroughly investigated the possibility of multiple towers, even though this was a potentially viable alternative that Verizon and DRA discussed. The Court thus concludes that DRA has not sustained its contention that it investigated thoroughly whether the Walmart site, plus another site to the north, would be a viable alternative to the Geneva Christina site.

**iii. Other properties**

Geneva further contends that DRA did not make a genuine effort to contact other property owners within the search ring after it learned that the owner of the Geneva Christina site was interested in signing a lease. DRA argues that it fully investigated every potential site in the search ring and that none are viable options.

In *Helcher*, the Seventh Circuit held that conclusory statements from a provider are not sufficient to show that the provider has investigated all feasible alternative options. *Helcher*, 595 F.3d at 728. The court found that, without a detailed explanation

of why certain properties were not viable locations, the provider essentially argued, "Trust us; we looked." *Id.*

The main evidence DRA offers to explain why other potential properties are not viable is Dolan's recollection at trial, years after the outreach occurred, that the property owners were not interested in signing a lease. Dolan testified that he evaluated all sixty-five properties in the search area that may be potential sites. He also testified that he is not aware of any interest from any other property owner that would be a viable option for the proposed macro tower. But Dolan did not provide any details about the outreach to the majority of these properties or the responses, or lack thereof, by the property owners. Instead, Dolan testified that he and a consultant, Paul Sileo, identified ten properties that may fit the required criteria and reached out to those property owners. Dolan testified that two of the properties were ruled out because they were in the flood plain and that six of the owners did not respond to outreach from Dolan and Sileo. He further testified that two of the owners who responded turned town the proposal based on the space that the tower would require. Finally, Dolan testified that the final property owner who responded owned the Geneva Christina site and expressed interest in leasing the property for the proposed tower.

Dolan also testified about a specific property on Randall Road that Geneva asked him to evaluate after DRA withdrew its original application for a special use permit for the Geneva Christina property. Dolan testified that he investigated the site by doing a site walk and contacting the property owner. The leasing agent for the property responded "No thanks" to Dolan's outreach. Pl.'s Ex. 26. Dolan explained that the property owner ultimately did not want to lose the space, so the denial was not a

function of the lease offer. Based on this response, Dolan determined that this particular property was not a viable candidate.

DRA offered minimal contemporaneous documentation to support Dolan's testimony. Aside from a chart submitted with DRA's zoning application, the record is devoid of evidence showing why Dolan and Sileo only identified ten properties as potentially viable sites (and discarded the other fifty-five as apparently not even worthy of additional investigation). The chart submitted with DRA's zoning application identifies only twenty-five properties, including at least one that was outside the search ring. The "viability" column on the chart includes conclusory statements such as "pond behind building" and "300 feet from residential," without explaining the significance of these points. Pl.'s Ex. 35 at 22. And, as Geneva pointed out at trial, at least one of these statements conflicts with Dolan's testimony. The entry that corresponds with the Shoppes at Randall Square (listed as "James Schiappa") states that the viability concern was "pond behind building." *Id.* Dolan testified, however, that the property was actually a viable option until the property owner stopped responding to DRA's outreach.

The limited contemporaneous email records tell a mixed story. At least one contemporaneous email conflicts with Dolan's testimony that DRA investigated all potentially viable properties within the search ring. On July 5, 2019, Sileo emailed Dolan and stated that he found contact information for five of the property owners for properties they identified as potentially viable and reached out to them. Pl.'s Ex. 16. Sileo stated that one property owner had gotten back to him that they weren't interested due to space and the current company leasing the property. *Id.* He also noted that he was only able to find physical addresses for the other five properties owners but could

send letters to them. *Id.* Dolan responded a few days later, on July 8, that DRA "can stop the research side and try and get [a] business term agreement" when Sileo came "across one interested candidate with decent zoning prospects[.]" *Id.* This indicates a less-than-complete job of vetting possible alternative sites and conflicts with Dolan's assertion that DRA investigated all properties in the search ring. This is also the only contemporaneous email record that addresses the outreach to, and any response from, the owners of the ten (or eleven) properties that Dolan testified he and Sileo identified as potentially viable for the proposed tower. On the other hand, Dolan noted in a July 18, 2019 email that DRA was "contacting each and every property owner in the search ring, in conjunction with input from planning director." Pl.'s Ex. 15. But, again, the record does not include any contemporaneous documentation to support this statement.

On July 12, 2021, Dolan told the owner of the Geneva Christina property that DRA planned to re-file its special use permit application after it "re-certif[ied] why other sites are *less desirable* to the network and to the City." Pl.'s Ex. 22 (emphasis added). But again, the fact that a property is less desirable to the provider does not mean it is not a feasible option. *See Omnipoint Holdings*, 586 F.3d at 51. The Court notes that the record contains no other evidence to support a contention that DRA actually took any action in 2021 to "recertify" why other sites were not viable alternatives for the proposed tower.

Unlike the Shoppes at Randall Square property, DRA did not provide contemporaneous documentation that supports its assertions that the owners of all other viable properties in the search ring rejected the proposed tower. And, as discussed, the testimony at trial falls short of the mark in several significant respects. ,

DRA is asking the Court to, in effect, trust that it thoroughly investigated all potential sites within the search ring. But Dolan's testimony regarding DRA's investigation of other potentially viable sites largely consists of conclusory statements that, in significant instances, conflict with the contemporaneous records. The Court concludes that DRA has not met its burden to show that it investigated thoroughly other potential viable properties within the search ring to the point that any further efforts would be fruitless.

## Conclusion

For the reasons above, the Court finds that DRA has not met its burden to show that Geneva's denial of DRA's October 3, 2023 special use permit application effectively prohibited wireless service in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II). The Clerk is directed to enter judgment stating: Judgment is entered in favor of defendant City of Geneva, Illinois.

MATTHEW F. KENNELLY
United States District Judge

Date: August 25, 2026